**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

JOHN FREDRICK FORDLEY,
*Plaintiff-Appellant*,

v.

JOE A. LIZARRAGA, Warden;
WINKFIELD, Officer; GARCIA,
Officer; WATSON, Sergeant;
SHRODE, Officer; CODER, Officer,
*Defendants-Appellees*,

and

MOORE, Officer; ANDREA, Officer,
*Defendants*.

No. 19-15691

D.C. No.
2:16-cv-01985-
MCE-EFB

OPINION

Appeal from the United States District Court
for the Eastern District of California
Morrison C. England, Jr., District Judge, Presiding

Argued and Submitted February 12, 2021
San Francisco, California

Filed November 10, 2021

Before: Marsha S. Berzon, Morgan Christen, and
Bridget S. Bade, Circuit Judges.

Opinion by Judge Christen;
Dissent by Judge Bade

**SUMMARY**[*]

**Prisoner Civil Rights/Administrative Exhaustion**

The panel affirmed in part and reversed in part the district court's summary judgment in favor of prison officials for failure to exhaust administrative remedies under the Prison Litigation Reform Act, 42 U.S.C. § 1997e, in an action brought pursuant to 42 U.S.C. § 1983.

Plaintiff asserted that he was physically and sexually assaulted in March of 2016 while he was an inmate at Mule Creek State Prison. Plaintiff filed his first grievance (the March grievance) in March 2016, which defendants failed to process. Plaintiff submitted a second administrative grievance (the May grievance) in May 2016 concerning subsequent events, but which referred to the March assaults. The district court reasoned that because the March assaults were mentioned in the May grievance which was pending when plaintiff filed his § 1983 action, an avenue of administrative relief remained open as of the time plaintiff filed his § 1983 complaint. Accordingly, the district court ruled that plaintiff could not be excused from exhausting the March grievance.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

The panel held that the prison's failure to respond to plaintiff's March 2016 grievance concerning physical and sexual assault rendered the administrative appeals process "unavailable" within the meaning of the PLRA. Where inmates take reasonably appropriate steps to exhaust but are precluded from doing so by a prison's erroneous failure to process the grievance, the exhaustion requirement is satisfied. The panel rejected defendants' contention that the May grievance had the effect of unexhausting the March grievance. The panel held that a later-filed grievance that alleges new complaints but refers to a previous and already-exhausted grievance for context does not render the first grievance unexhausted. Thus, the district court erred by dismissing as unexhausted plaintiff's claims premised on the March 2016 grievance.

The panel agreed with the district court that plaintiff failed to exhaust his claim against the warden because there was no indication that any of plaintiff's administrative complaints suggested the warden was aware of the defendants' alleged conduct. The panel further held that because the May 2016 grievance was still pending when plaintiff filed his complaint, the district court properly deemed the May 2016 grievance unexhausted.

Dissenting, Judge Bade stated that so long as there is a possibility of some relief for the action complained of, administrative remedies are available. Plaintiff's May 2016 grievance clearly related to the March 2016 physical and sexual assault claims, and it was still in process when plaintiff filed suit. The administrative process was available because plaintiff was actively using it at the time he filed suit and that process provided potential remedies for his claims. Therefore, plaintiff did not exhaust his claims that he was

assaulted in March 2016, and the majority erred when it allowed plaintiff to evade his obligation to do so. Because plaintiff did not exhaust his claims, the defendants were entitled to summary judgment.

## COUNSEL

Margaret A. Upshaw, Latham & Watkins LLP, Washington, D.C., for Plaintiff-Appellant.

Kevin A. Voth, Deputy Attorney General; Neah Huynh, Supervising Deputy Attorney General; Monica N. Anderson, Senior Assistant Attorney General; Rob Bonta, Attorney General; Attorney General's Office, San Francisco, California; for Defendants-Appellees.

## OPINION

CHRISTEN, Circuit Judge:

John Fordley, a former inmate at California's Mule Creek State Prison, appeals the district court's order dismissing his Eighth Amendment claims against the Mule Creek warden and several Mule Creek guards. The district court concluded that Fordley did not satisfy the requirements of the Prison Litigation Reform Act, 42 U.S.C. § 1997e. We affirm in part, reverse in part, and remand.

The prison's failure to respond to Fordley's March 2016 grievance concerning physical and sexual assault rendered the administrative appeals process "unavailable" within the meaning of the PLRA. Thus, the district court erred by dismissing as unexhausted Fordley's claims premised on the March 2016 grievance. But we agree that Fordley failed to exhaust his claim against the warden, and we affirm the district court's dismissal of that claim.

Fordley filed a second grievance in May 2016 complaining of different abuse he suffered after returning to Mule Creek from a crisis bed at a different prison facility. That grievance was still pending when Fordley filed his complaint, so the district court properly deemed the May 2016 grievance unexhausted. Fordley does not appeal the dismissal of the claims that were premised on his May 2016 grievance.

I

A

Fordley contends that he was physically and sexually assaulted in March of 2016 while he was an inmate at Mule Creek State Prison. He identified four correctional officers as his attackers: Sergeant Watson and Officers Winkfield, Garcia and Moore. Fordley's version of events is that defendants came to his cell on March 10 after Fordley objected that he had not received medical supplies. The defendants harshly rebuked Fordley for complaining and, over his shouted protests, radioed the watch commander that Fordley was unresponsive and entered his cell in full tactical gear. Fordley describes being slammed to the ground and beaten for a period of five to ten minutes, then being thrown into a "cage" near the Sergeant's office, where he remained while the defendants laughed and bragged to passers-by about the beating. Fordley claims he was later returned to his cell without being allowed to receive medical treatment and asserts that defendants falsified a report stating that he refused medical attention. Fordley alleges that three of the four officers returned the next day, wearing face and body shields, and beat him again. This time, Officer Winkfield allegedly held Fordley down while Officer Garcia rubbed a baton on his body in sensitive areas and pressed it "against [his] anal cavity." Fordley alleges the officers laughed and told him "next time the whole baton goes in your a-- ."

On March 15, Fordley was sent to a crisis bed at High Desert State Prison. There, a nurse documented bruises on his body and open wounds on his head. Fordley contends he sustained the wounds in the March 10 and March 11 assaults. When he returned to Mule Creek on March 24, Sergeant

Watson and Officers Winkfield and Garcia continued to work in the unit where Fordley was held. Fordley contends they harassed him daily by giving him razor blades and encouraging him to kill himself, threatening to kill him themselves, threatening future sexual assaults, spitting in his food, and withholding both meals and sheets.

Fordley filed his first grievance (the March grievance) on March 27, 2016. He used California Department of Corrections and Rehabilitation (CDCR) Form 602, the form required for presenting "Inmate/Parolee Appeals." Form 602 consists of multiple double-sided pages that are passed back and forth between the inmate and the prison as the inmate's grievance proceeds through each level of review. Thus, as is the case here, a single Form 602 may contain entries from an inmate and various prison officials made over the course of many weeks or even months. The confusing format of Form 602 requires a reader to carefully decipher the chronological sequence of exchanges between an inmate and the prison to understand the grievance and response. No copy of Fordley's March Form 602 is in the record, but other documents refer to and describe the grievance. After reviewing the record, the district court concluded that the grievance qualified as an emergency grievance because of the nature of its allegations. Fordley asserts the March grievance lodged complaints against defendants Watson, Winkfield, Garcia and Moore arising from the assaults that allegedly occurred on March 10 and 11.

On April 5, Fordley submitted a request for information about the status of the March grievance using CDCR Form 22, the form for an "Inmate/Parolee Request." Prison officials responded the same day, stating: "The appeal you reference having filed here has been received and will be

processed in the order received." A week later, having received no further response or information about his March grievance, Fordley submitted a second request for a status report, using another CDCR Form 22. Fordley wrote that he filed the March grievance "[b]ecause of safety concerns and harassment [and] assault by CDCR staff which per (op) is suposed to be processed immediately. But you['re] denying me that, you['re] refusing to file both of my CDCR [Form] 602s I filed due to assault and discrimination." In a written response dated April 14, the prison again acknowledged receiving Fordley's March 27 grievance and also acknowledged receiving his April 12 request for follow up: "Your two appeals dated 3-27-16 and 4-13-16 have been received [and] are being processed." On April 15, Fordley received another confirmation from the prison that his March 27 grievance had been received. The April 15 notice also advised that the first-level review was in process, but did not include a log number or other means of tracking the March grievance. This notice was the last response Fordley received concerning the March grievance.

Fordley submitted a second administrative grievance (the May grievance) on May 8, 2016 concerning events that occurred after he returned from the crisis bed. In the single line provided on Form 602 for complainants to "State briefly the subject of your appeal," Fordley wrote "Harassment/Giving me contraband - CDCR staff." And in the space that directed "Explain your issue," Fordley reported that the same officers who had assaulted him in March had continued harassing him after he returned from the hospital:

> I told you in 4 prior [Form] 602s and CDCR [Form] 22s that my life was in danger. You ignored it. I want out of here. There going to

kill me. This assault and sexual assault took place March 9th, 10th, 11th 2016. When returning from the hospital these officers kept harassing me and threatening me. On May 2nd (one of the COs who sexually assaulted me on March 10th) became the regular in A5. I told them for 2 months I wasn't safe. Now back in ASU, Officer Winfield [sic] and Sgt Watson tried to have me kill myself by handing me a orange razor and told me to kill myself or they would. I turned it in to a Lt who 206 told to see me on 5/5/2016 around 7:20 pm. then on 5/6/2016 at breakfast time I was given another razor by Winfield [sic] and Officer Garcia which I turned in again to the same Lt approx: same time 7:20 pm After he was seeing 206 again, they keep handing me contraband to kill myself, and if I don't they will they say. 106-Mullens and 206 and 205 before they moved them are witnesses. they refuse to give me meals, sheets . . . You trying to kill me/set me up.

In short, the May grievance referred to the March assaults to explain: (1) that Fordley had been expressing concern for his safety for two months' time; (2) that the staff involved in the March assaults continued to work in the area where Fordley was detained; and (3) that after he returned from the crisis bed, the same prison guards were giving him contraband, encouraging him to take his own life, threatening to kill him themselves, and withholding meals and sheets.

The California regulations governing the process for reviewing inmate grievances have changed since the time of

these events, but the scheme that was in place when Fordley filed his grievances required that inmate complaints concerning imminent assaults or concerns for an inmate's physical safety be given priority and bypass first-level review.[1] *See* Cal. Code Regs. tit. 15 § 3084.9(a)(4) (2015). Nevertheless, the response Fordley received on April 15 informed him that his March grievance was being reviewed at the first level.

On May 19, 2016, Fordley received notice that his May grievance had been routed directly to second-level review, and he was interviewed regarding the March and May incidents. But on July 5, the prison informed Fordley that it had completed its investigation and determined the staff's actions were within department policy. Fordley appealed the denial of the May grievance to the third level the next day, strenuously arguing that the prison officials "always try to push crap under the carpet," and restating that the same officers and sergeant who sexually and physically assaulted him in March were threatening him and refusing to feed him or give him medical supplies. Fordley wrote, "It took 1 ½ months to accept my complaints. A violation already," and went on to recount "being given orange . . . razors to kill myself, the only way one gets these is from staff."[2]

---

[1] Unless otherwise indicated, we cite to the version of the California Code of Regulations in effect at the time Fordley filed his March grievance.

[2] This portion of the administrative record is difficult to decipher, and both parties seem to have misread it. We have carefully examined Fordley's grievances and the prison's responses to accurately recount the sequence of events.

B

Fordley filed a pro se complaint in the Eastern District of California pursuant to 42 U.S.C. § 1983 on August 22, 2016. It alleged that Sergeant Watson and Officers Winkfield, Garcia and Moore violated his Eighth Amendment right to be free from cruel and unusual punishment, and that Warden Lizarraga was deliberately indifferent to the violation of Fordley's constitutional rights.[3]   On March 10, 2017, approximately ten months after it was filed, Fordley's May grievance was denied after the third-level review was completed.  Critically for purposes of this appeal, the third-level decision limited its description of the May grievance to staff giving Fordley a razor and telling him to kill himself, and refusing to give him meals and sheets.  The third-level decision made no mention of the alleged March assaults.

Defendants filed a motion for summary judgment seeking dismissal of plaintiff's complaint on the grounds that the complaint was filed before Fordley had exhausted his administrative remedies.  The district court first granted summary judgment in favor of defendants on the claims that Fordley raised for the first time in the May grievance; i.e., those concerning defendants' alleged harassment of Fordley after he returned from the crisis bed at a separate prison facility.  Fordley does not appeal the dismissal of those claims.[4]

---

[3] Fordley named other officers in his complaint, but the district court dismissed them early in the litigation for improper service.

[4] The district court adopted in full the findings and recommendations of  the magistrate judge.  References to the district court's findings

The district court gave Fordley an opportunity to produce any evidence he had of the missing March grievance so the court could determine whether he should be excused from exhausting his administrative remedies as to that grievance. The court also allowed defendants twenty-one additional days to file a supplemental reply after receiving Fordley's response.

As directed, Fordley filed a statement explaining the steps he took to file the March grievance. He also filed the prison's April 5 response to the grievance in which the prison acknowledged receipt of the March grievance and informed Fordley that the grievance would be "processed in the order received." The district court described Fordley's evidence as "compelling" proof corroborating his contention that he had submitted a grievance in March regarding "allegations of staff assault and an allegation of staff sexual misconduct" by the defendants. The prison neither produced the March grievance nor explained what became of it, and the court decided the prison failed to timely process it.

The district court considered the Ninth Circuit's decision in *Brown v. Valoff*, 422 F.3d 926 (9th Cir. 2005), and concluded that the Ninth Circuit had not adopted a rule that delay in responding to a grievance renders administrative remedies *per se* unavailable. The court was persuaded by the decisions of other district courts that a prison's delay in responding to an inmate complaint excuses a failure to exhaust only where the inmate has waited a reasonable period of time and received no response or explanation for the delay. Applying that rule to the facts in Fordley's case, the court

therefore refer to the findings of the magistrate judge, as adopted by the district court.

agreed with defendants that an avenue of administrative relief remained open as of the time Fordley filed his complaint. The court reasoned that the March 10 and 11 assaults were mentioned in the May grievance and the May grievance was still pending when Fordley filed his complaint. Accordingly, the court ruled that Fordley could not be excused from exhausting the March grievance. The order memorializes the court's impression that the "claims regarding the alleged assaults were actually eventually exhausted in [the May grievance]."

The district court also dismissed Fordley's deliberate indifference claim against Warden Lizarraga, concluding that Fordley's claims against the warden were not exhausted.

Fordley was released from prison in August 2020, but he timely appealed the district court's ruling. We have jurisdiction pursuant to 28 U.S.C. § 1291. We reverse the district court's judgment in part and affirm it in part.

II

We review de novo a district court's summary judgment ruling that an inmate has not exhausted his claims within the meaning of the Prison Litigation Reform Act (PLRA). *See Albino v. Baca*, 747 F.3d 1162, 1171 (9th Cir. 2014) (en banc). The PLRA's exhaustion requirement is an affirmative defense. *Jones v. Bock*, 549 U.S. 199, 216 (2007). The defendant bears the burden of showing that an administrative process was available to the inmate and that the inmate failed to exhaust it. *Draper v. Rosario*, 836 F.3d 1072, 1079 (9th Cir. 2016) (citing *Albino*, 747 F.3d at 1172). Once the defendant shows that such a remedy was generally available, the burden shifts to the inmate to show that something in his

particular case made the generally available administrative remedies effectively unavailable to him. *Id*. Because the failure to exhaust is an affirmative defense that defendants must plead and prove, the ultimate burden of proving that the inmate has not exhausted his claims remains with the defendants. *Id.*

III

A

Fordley argues the district court erred by granting the defendants' summary judgment motion because he fully exhausted the available administrative remedies for his March grievance. The PLRA requires inmates to exhaust their administrative remedies before filing suit: "No action shall be brought with respect to prison conditions . . . by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a); *see also Woodford v. Ngo*, 548 U.S. 81, 90–91 (2006).

In *Woodford*, the Supreme Court explained that exhaustion requires complying with a prison's "critical procedural rules" and it is justified by the need to "impos[e] some orderly structure on the course of its proceedings." 548 U.S. at 90–91. We recognized in *Fuqua v. Ryan*, 890 F.3d 838 (9th Cir. 2018), that requiring exhaustion serves other important objectives, including "alert[ing] prison officials to 'the nature of the wrong for which redress [is] sought,'" and allowing prisons "to take corrective action where appropriate." *Id.* at 844 (quoting *Griffin v. Arpaio*, 557 F.3d 1117, 1120 (9th Cir. 2009) and citing *Reyes v. Smith*, 810 F.3d 654, 658 (9th Cir. 2016)). "Exhaustion also

allows a prison's administration 'to address complaints about the program it administers before being subjected to suit, reducing litigation to the extent complaints are satisfactorily resolved, and improving litigation that does occur by leading to the preparation of a useful record.'" *Id.* (quoting *Jones*, 549 U.S. at 219).

After *Woodford*, the Supreme Court clarified in *Ross v. Blake*, 136 S. Ct. 1850 (2016), that because the PLRA only requires exhaustion of "available" remedies, "an inmate is required to exhaust those, but only those, grievance procedures that are capable of use to obtain some relief for the action complained of." *Id.* at 1858–59 (internal quotation marks omitted) (quoting *Booth v. Churner*, 532 U.S. 731, 738 (2001)). To exhaust administrative remedies, inmates must comply with the prison's "deadlines and other critical procedural rules." *Woodford*, 548 U.S. at 90.

The Supreme Court has recognized three situations in which an administrative remedy is unavailable: (1) "when (despite what regulations or guidance materials may promise) it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates"; (2) if it is "so opaque that it becomes, practically speaking, incapable of use"; and (3) "when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Ross*, 136 S. Ct. at 1859–60.

We have recognized specific circumstances that render administrative remedies unavailable, *see, e.g.*, *Andres v. Marshall*, 867 F.3d 1076, 1078–79 (9th Cir. 2017), and on more than one occasion have found administrative processes effectively "unavailable even though they exist on the

books," *Fuqua*, 890 F.3d at 849. For example, in *Marella v. Terhune*, 568 F.3d 1024 (9th Cir. 2009) (per curiam), we held an administrative remedy was effectively unavailable because the inmate did not have access to the proper grievance form within the prison's time limits for filing a grievance. *Id.* at 1026. In *Nunez v. Duncan*, 591 F.3d 1217 (9th Cir. 2010), an administrative remedy was unavailable because the inmate would have needed to access an unobtainable policy in order to bring a timely administrative appeal. *Id.* at 1226. Our court sitting en banc also concluded that administrative remedies were unavailable where a manual describing the complaint process was kept from inmates. *Albino*, 747 F.3d at 1173–75.

Most relevant here, where inmates take reasonably appropriate steps to exhaust but are precluded from doing so by a prison's erroneous failure to process the grievance, we have deemed the exhaustion requirement satisfied. *Andres*, 867 F.3d at 1079; *Sapp v. Kimbrell*, 623 F.3d 813, 823 (9th Cir. 2010) ("If prison officials screen out an inmate's appeals for improper reasons, the inmate cannot pursue the necessary sequence of appeals, and administrative remedies are therefore plainly unavailable."). Where no administrative relief is available, requiring exhaustion contradicts the PLRA's purpose and it is not required. *See Andres*, 867 F.3d at 1079.

Fordley contends the prison never substantively responded to his March grievance and that its failure to do so rendered the generally available administrative remedies effectively unavailable to him. Defendants counter that because Fordley's May grievance mentioned the alleged March assaults—and because the May grievance had not been finally denied when Fordley filed his complaint—there were

still administrative remedies available and his complaint was properly dismissed. Because this appeal requires us to decide whether Fordley exhausted all of the administrative remedies available to him, we describe in some detail the administrative grievance process that was in effect when Fordley attempted to grieve the assaults that allegedly occurred on March 10 and 11.

B

The regulations in effect when Fordley filed the March grievance required inmates to use Form 602 and established a three-level review process that inmates initiated by filing grievances with the prison's appeals coordinator. Cal. Code Regs. tit. 15, §§ 3084.2(a), 3084.7. The regulations required inmates to submit their grievances within thirty calendar days of "[t]he occurrence of the event or decision being appealed." § 3084.8(b)(1).

The operative regulations generally required the prison to respond to grievances within thirty working days.[5]  *See* §§ 3084.7(h), 3084.8(c)(1)–(3). Inmates dissatisfied with the prison's first-level review were allowed to appeal to a second level, § 3084.7(b), and then to a third-level review conducted under the Appeals Chief's supervision, §§ 3084.7(d)(3), 3084.8(c)(3). Prison administrators were allowed thirty working days to respond to second-level grievances and sixty working days to conduct third-level reviews. § 3084.8(c). The operative regulations allowed prisons the discretion to

---

[5] The regulations allowed the prison more time to respond to non-emergency grievances, if the prison notified the inmate of the reason extra time was needed and the inmate was given a new estimated response date. Cal. Code Regs. tit. 15, § 3084.8(d), (e).

dismiss inmates' grievances if the inmates failed to comply with any of their filing deadlines. § 3084.6(c)(4).

The regulations called for much more expedited review of emergency grievances. Emergency grievances were those raising "serious and imminent threat[s] to health or safety," such that "the regular appeal time limits would subject the inmate . . . to a substantial risk of personal injury or cause other serious and irreparable harm." § 3084.9(a)(1). The regulations required emergency grievances to be sent directly to the second level, where prison administrators were allotted just five working days to respond. § 3084.9(a)(4). If a grievance was "received as an emergency" but prison officials later determined that it did not meet the emergency criteria, another regulation required the prison to notify the inmate that the grievance would not be treated as an emergency and also required the prison to give notice whether the grievance was accepted for regular processing or rejected. § 3084.5(b)(2).

C

After reviewing Fordley's supplemental filing, the district court determined that Fordley's March grievance alleged physical and sexual assault by defendants and that the prison was required to treat Fordley's March grievance as an emergency.[6] On appeal, defendants begin by arguing it cannot be determined whether the grievance sufficiently

---

[6] The district court mistakenly cited to newer regulations that require a response to allegations of sexual assault within 48 hours. The regulation in effect in March of 2016 required prison officials to respond to emergency grievances within five working days. Cal. Code Regs. tit. 15, § 3084.9(a)(4).

explained the nature of Fordley's allegations without a copy of the March grievance, and they suggest the March grievance may not have demonstrated that it warranted emergency processing. For several reasons, defendants' arguments are unavailing.

First, the failure to exhaust administrative remedies is an affirmative defense for which defendants bear the initial burden of showing that an administrative process was available. *Albino*, 747 F.3d at 1172. Defendants also bear the ultimate burden of proof. *Id.* Although Mule Creek generally had an administrative process for handling emergency grievances, Fordley demonstrated that the grievance process was effectively unavailable to him because the prison never responded to the March grievance. *See Andres*, 867 F.3d at 1079 ("When prison officials improperly fail to process a prisoner's grievance, the prisoner is deemed to have exhausted available administrative remedies."). The prison acknowledged receipt of Fordley's March grievance three times, yet they failed to assign it a log number for tracking purposes and never substantively respond to it. In contrast, the prison's response to Fordley's May grievance contains a log number, the date received, and a note that "[l]og numbers are assigned to all appeals for tracking purposes." The record does not include the precise language Fordley used to report the March assaults because the Form 602 was lost. The prison's acknowledgment of the March grievance only stated the date Fordley submitted it and memorialized that the grievance was "in process." But on this record, the fact the March grievance is missing must be attributed to a failure of the prison's grievance processing system.

Defendants and the dissent speculate that the March grievance may not have signaled that Fordley was reporting an imminent risk to his health or safety. But as the district court recognized, Fordley's April follow-up inquiries unambiguously put the prison on notice that he felt his life was in danger. The only response he received from the prison informed him that the grievance was "in process" at the first level, contrary to § 3084.9(a)(4), which required the March emergency grievance to bypass the first-level review altogether.

On April 12, Fordley submitted a CDCR Form 22 in another attempt to prompt a response to the March grievance. He wrote that the March grievance raised *"safety concerns* [and] harassment and *assault by . . . staff*," (emphasis added), and he alerted the prison that his grievance was to be "processed immediately." We read this record the way the district court did, and conclude the April 5 and 12 follow-up requests transparently communicated that Fordley's complaint was one that qualified as an emergency grievance under the operative regulations. Further, the April requests provide unrefuted evidence that Fordley contemporaneously conveyed his sense of urgency to the officials at Mule Creek. Defendants point to no evidence to support their suggestion that Fordley's characterization of the March grievance may be a post hoc litigation strategy.

The May grievance also sheds light on how Fordley described the March assaults. Though the dissent repeatedly treats the May grievance as if it merely reasserted Fordley's complaint about the assaults that occurred in March, the May grievance called prison officials' attention to events that allegedly transpired after the March assaults, and after Fordley returned to Mule Creek from a crisis bed at a separate

facility. In the process of explaining the harassment and threats that allegedly transpired after Fordley returned from the crisis bed, the May grievance asserted that the guards who were harassing him in May were some of the same guards who had physically and sexually assaulted him in March. The May grievance also gave notice that Fordley felt his life was in danger.[7]

The district court correctly ruled that the operative regulations required the prison to treat the March grievance as an emergency. *See* Cal. Code Regs. tit. 15 § 3084.9(a)(1) (defining circumstances constituting an emergency). As such, the prison was required to complete its second-level review within five working days. § 3084.9(a)(4) ("If emergency processing is warranted, . . . the second level review *shall* be completed within five working days" (emphasis added)); § 3000.5(c) (defining "shall" as "mandatory"). Yet the prison did not respond.

---

[7] The prison's response confirms that it read the May grievance the same way. As the Supreme Court explained in *Woodford v. Ngo*, 548 U.S. 81 (2006), an inmate must initially fill out two parts of Form 602: in part A the inmate must describe the basis for his complaint; and in part B the inmate must describe the relief he seeks. *See id.* at 85. Part C of Form 602 provides a space for the prison to respond to the inmate's complaint, and part D provides a space for the inmate to indicate whether he is dissatisfied with the prison's first-level response. In part E, the prison notifies the inmate of its decision on second-level review, and in part F, the inmate may request third-level review. Having carefully retraced the language Fordley used in parts A and B of his May 8, 2016 grievance; the prison's response in part E dated July 5, 2016; and Fordley's request for third-level review in part F dated July 6, 2016; it is apparent that the initial May grievance complained about events that occurred after Fordley returned from the crisis bed, not the March 10 and 11 assaults.

In *Andres*, our court considered whether an administrative remedy was rendered unavailable to an inmate who had submitted a first-level grievance, received no response for six months, and then filed suit. 867 F.3d at 1077–78. We concluded the grievance process was effectively unavailable because the prison's failure to respond thwarted the inmate from taking advantage of the grievance system. *Id.* at 1079. And in *Brown*, we specifically cautioned that "[d]elay in responding to a grievance, *particularly a time-sensitive one*, may demonstrate that no administrative process is in fact available." 422 F.3d at 943 n.18 (emphasis added). Every circuit to have considered the issue has agreed that a prison's failure to respond renders an administrative remedy unavailable.[8] Our court has also expressly recognized that

---

[8] *See Hayes v. Dahlke*, 976 F.3d 259, 270–71 (2d Cir. 2020); *Shifflett v. Korszniak*, 934 F.3d 356, 365 (3d Cir. 2019) ("[W]e hold that as soon as a prison fails to respond to a properly submitted grievance or appeal within the time limits prescribed by its own policies, it has made its administrative remedies unavailable and the prisoner has fully discharged the PLRA's exhaustion requirement."); *Moore v. Bennette*, 517 F.3d 717, 725 (4th Cir. 2008) (holding an inmate who uses all available remedies has exhausted "even if prison employees do not respond"); *Boyd v. Corr. Corp. of Am.*, 380 F.3d 989, 996 (6th Cir. 2004) (holding "that administrative remedies are exhausted when prison officials fail to timely respond to a properly filed grievance"); *Jernigan v. Stuchell*, 304 F.3d 1030, 1032 (10th Cir. 2002) ("[T]he failure to respond to a grievance within the time limits contained in the grievance policy renders an administrative remedy unavailable . . . ."); *Lewis v. Washington*, 300 F.3d 829, 833 (7th Cir. 2002) (agreeing remedies are exhausted "when prison officials fail to respond to inmate grievances because those remedies had become unavailable," because the court "refuse[d] to interpret the PLRA so narrowly as to permit prison officials to exploit the exhaustion requirement through indefinite delay in responding to grievances" (internal quotation marks and alterations omitted)); *Foulk v. Charrier*, 262 F.3d 687, 698 (8th Cir. 2001) (agreeing inmate's administrative proceedings were not available when prison did not respond to complaint).

once an administrative remedy is exhausted, a claimant need not do more. *See id.* at 935 n.10 (observing that "over-exhaustion" is not required); *accord Williams v. Wexford Health Sources, Inc.*, 957 F.3d 828, 833–34 (7th Cir. 2020) (explaining inmates must complete the prison's required steps, but that "does not mean that [an] inmate must go beyond the established system and guess at some other way of attracting the attention of the prison authorities").

Defendants next contend that, by filing his May grievance, Fordley initiated a new round of administrative review of the March assault allegations. Their argument is that by accepting the May grievance and processing it, the prison corrected its failure to respond to the March grievance and provided an avenue for Fordley to secure administrative relief. In other words, defendants contend that Fordley's May grievance had the effect of *unexhausting* the March grievance.

The first problem with defendants' argument is that it is premised on a version of the facts that is not supported by the administrative record. The record establishes that the subjects of Fordley's May grievance were events that occurred after he returned to Mule Creek from the crisis bed at a separate facility, not the March assaults. Beginning with his succinct description in the space on the Form 602 that directs inmates to "State briefly the subject," Fordley wrote that the May grievance concerned "Harassment/Giving me contraband - CDCR staff," and went on to describe actions that allegedly took place after he returned from the hospital, well after the alleged March 10 and 11 assaults.

The record does show that the prison responded to the May grievance by interviewing Fordley twice. One interview

concerned the March assaults and one addressed the events that allegedly transpired after Fordley returned from the off-site crisis bed. Defendants suggest that if an inmate files duplicative grievance forms, the inmate is obliged to await the prison's response before filing suit. But defendants offer no support for this proposition, and even if we were to accept it, the text of Fordley's May 8 grievance refutes the applicability of such a rule here because Fordley's May grievance was not duplicative of his March grievance. Fordley's entries in parts A and B of the May 8 Form 602 show Fordley was grieving new threats and harassment. The prison's choice to respond to the May grievance by interviewing Fordley about the March assaults cannot be accurately described as an attempt by Fordley to give the prison officials another shot at responding to the March assaults. And contrary to the defendants' argument on appeal and the district court's ruling, the prison's third-level response leaves no doubt that the prison did not consider the May grievance to include the March allegations. The prison's third-level response stated:

> **I. Appellant's Argument:** It is appellant's position that Mule Creek State Prison (MCSP) staff tried to have him kill himself by handing him a razor. The appellant asserts that Correctional Officer (CO) Winkfield and Correctional Sergeant Watson gave him a razor and told him to kill himself. The appellant contends that he gave the razor to a Correctional Lieutenant. The appellant claims that on May 5, 2016, he was given another razor by CO Winkfield and CO Garcia, which he again gave to the same Correctional Lieutenant. The appellant states they keep

> giving him contraband to kill himself and they
> are refusing to give him meals and sheets.
> The appellant requests that he be moved.

In short, the May grievance was not directed at the March assaults and was not understood by the prison officials to be a complaint about those assaults. Contrary to the district court's ruling, the prison's third-level response expressly resolved only the May grievance.

Even if the May grievance had comprised an unambiguous, standalone reassertion of a grievance concerning the March assaults, we have no case law supporting defendants' suggestion that an inmate's reassertion of a concern—especially a request for a response to an ignored emergency grievance—somehow operates to unexhaust a previously exhausted claim. *Cf. Brown*, 422 F.3d at 935 n.10 (concluding that there is no requirement for "an inmate to continue to appeal a grievance once relief is no longer 'available'"). Nor can we see how such a rule could be reconciled with the PLRA's goal of an orderly claims process. *See Fuqua*, 890 F.3d at 844 (explaining one of the PLRA's purposes is to "impos[e] some orderly structure on the course of its proceedings" (alteration in original) (quoting *Woodford*, 548 U.S. at 90–91)).

We cannot agree with defendants' suggestion that an unexhausted second grievance that mentions the factual context underlying an earlier, ignored grievance renders the first grievance unexhausted. The unworkability of this argument is best illustrated by considering how it would apply to inmates who claim to have suffered retaliation in response to filing a grievance. Where retaliation is alleged, inmates typically file an initial grievance and follow it with

a second grievance describing retaliatory action(s) taken in response to the first grievance. It is unreasonable to expect that an inmate would describe retaliatory conduct in a subsequent grievance without mentioning the initial grievance. *Cf. Rhodes v. Robinson*, 408 F.3d 559, 563 (9th Cir. 2005). But by the defendants' and dissent's reckoning, any mention of a first and unanswered grievance in a second grievance would render the first grievance unexhausted.

Defendants and the dissent also overlook that their interpretation of the regulations would leave Fordley with no recourse after the defendants failed to respond to the March grievance, a result entirely contrary to the goals and purpose of the PLRA. It is undisputed that after he filed the March grievance, the regulatory scheme severely cabined Fordley's options: it did not allow him to file a second grievance, Cal. Code Regs. tit. 15, § 3084.6(b)(1), or a duplicate grievance, § 3084.6(c)(2), or an untimely grievance concerning the March assaults, § 3084.6(c)(4). Further, as defendants conceded at oral argument, Fordley would not have been allowed to file an appeal to the next level of review because he had not received a response from the prison. Fordley's only recourse to the prison's silence was to file requests for information using CDCR Form 22 (Inmate/Parolee Request)—which he did—and to wait. After several months, it was apparent that no substantive response to his March grievance was forthcoming, and Fordley was permitted to file suit.

Boiled down, defendants' suggestion is that we should consider the prison's response time to be so flexible that an administrative process would be deemed unexhausted when a prison neither responds nor provides notice that additional time is needed. Such a rule would obliterate the primary

incentive for prisons to respond to inmates' grievances and leave inmates and courts guessing about whether and when suit may be filed. Yet the Supreme Court has cautioned that "no adjudicative system can function effectively without imposing some orderly structure on the course of its proceedings." *Woodford*, 548 U.S. at 90–92.

Defendants' fallback argument is that we should not rigidly apply the response times in the regulations. *See* Cal. Code Regs. tit. 15, §§ 3084.9(a)(4), 3000.5(c). They urge us to consider California's deadlines for prison responses to be flexible because § 3000.5(f) "do[es] not create a right to have [a] specified action taken within the time limits." But the regulations in effect in March 2016 prohibited prison officials from obtaining extensions of time to respond to emergency grievances. *See* § 3084.8(c), (f). Further, defendants' suggestion that they can benefit from a flexible view of the prison's allowable response times appears to be based on their contention that they were entitled to thirty working days to respond to Fordley's grievance. That assertion, in turn, is premised on defendants' continued and unavailing position that the March grievance did not allege an emergency. We agree with the district court that the record confirms the grievance was submitted, and the prison was on notice that Fordley was raising an emergency situation. From there, it follows that regulations allowed the prison just five working days to complete its second-level review. § 3084.9(a)(4). Because the prison never responded, viewing the allowable response times as flexible does not help the defendants in this case. The prison was not just tardy in responding to the March grievance; it never responded at all.

We hold that a later-filed grievance that alleges new complaints but refers to a previous and already-exhausted

grievance for context does not render the first grievance unexhausted. Accordingly, while the district court correctly ruled that an avenue of administrative relief remained open for Fordley's May grievance at the time Fordley filed his complaint, Fordley's May Form 602 did not render his March grievance unexhausted. Defendants' contrary rule would thwart the orderly process Congress envisioned when it required compliance with an agency's internal administrative rules, because inmates—and courts—must know when remedies are exhausted. *See Ross*, 136 S. Ct. at 1859; *Ahktar v. Mesa*, 698 F.3d 1202, 1211–12 (9th Cir. 2012) (reversing dismissal of inmate's complaint because he had exhausted the grievance process; the exhaustion of another grievance arising from the same issue, after the complaint was filed, was "immaterial"). We need not and do not decide whether to adopt a bright-line rule that *any* delay in a prison's response to an inmate's grievance is sufficient to render administrative remedies unavailable. *Cf. Shifflett*, 934 F.3d at 366. Nor, contrary to the dissent's assertion, do we suggest that deeming Fordley's March grievance exhausted is an equitable or discretionary remedy. By any measure, the prison's failure to respond to Fordley's emergency grievance over the course of several months rendered Fordley's administrative remedies unavailable.

## IV

Fordley's complaint also asserted a deliberate indifference claim against Warden Lizarraga for ignoring defendants' assaultive and harassing conduct. The district court dismissed this claim for failure to exhaust because Fordley's grievances did not "name or refer to" the warden. Fordley does not dispute that he did not name Warden Lizarraga in his March grievance. Indeed, none of Fordley's

administrative filings named the warden, nor did they describe the warden taking, or failing to take, actions that deprived Fordley of any federally guaranteed right. Fordley argues that his March grievance should have put the prison on notice that he intended to assert a deliberate indifference claim against the warden. "[W]hen a prison's grievance procedures are silent or incomplete as to factual specificity, 'a grievance suffices if it alerts the prison to the nature of the wrong for which redress is sought.'" *Griffin*, 557 F.3d at 1120 (quoting *Strong v. David*, 297 F.3d 646, 650 (7th Cir. 2002)). Here, there was no indication that any of Fordley's administrative complaints suggested the warden was aware of defendants' alleged conduct. On this record, the district court correctly ruled that Fordley did not exhaust his claim against Warden Lizarraga.

**REVERSED IN PART, AFFIRMED IN PART, REMANDED.**

BADE, Circuit Judge, dissenting:

In March, May, and June 2016, while he was an inmate at Mule Creek State Prison in California, John Fordley filed a series of three administrative grievances in which he alleged that correctional officers assaulted and harassed him and that the warden was deliberately indifferent to this conduct.[1] In

---

[1] Most of Fordley's claims, which the majority describes at length, are not at issue in this case. There is no dispute that Fordley failed to exhaust administrative remedies for his claims that the defendants tampered with his food, threatened future assaults, identified Fordley as a racist and sex offender before other inmates, and provided him with razor blades and

August 2016, while the claims he asserted in these grievances were still pending in the administrative review process before prison officials, Fordley sued the warden and several correctional officers, pursuant to 42 U.S.C. § 1983, and alleged that they subjected him to cruel and unusual punishment in violation of his Eighth Amendment rights.

The district court granted summary judgment and dismissed Fordley's claims without prejudice because it concluded that Fordley did not comply with the Prison Litigation Reform Act (PLRA), 42 U.S.C. § 1997e, which requires that a prisoner exhaust administrative remedies before filing suit.**[2]** As the district court correctly concluded, at the time Fordley filed suit "an avenue of administrative relief remained open to him on his claims—the third level of review for" the grievance he filed in May 2016. Therefore, Fordley had not exhausted administrative remedies before filing suit.

The majority, however, concludes that because the prison did not timely respond to Fordley's earlier grievance, filed in March 2016, "the administrative appeals process [was]

---

encouraged him to kill himself. The district court dismissed these claims without prejudice, and Fordley did not challenge the dismissal of these claims on appeal. Moreover, as the majority correctly concluded, Fordley failed to exhaust remedies for his claim against Warden Lizarraga, and the district court correctly dismissed this claim. Maj. Op. 28. Therefore, this appeal addresses only his claims that he was physically and sexually assaulted on March 10 and 11, 2016.

**[2]** Section 1997e(a) provides: "No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a).

'unavailable' within the meaning of the PLRA." Maj. Op. 5. Remarkably, the majority reaches this conclusion even though the prison was reviewing those claims on the merits in response to Fordley's subsequent grievance, filed in May 2016. *See* Maj. Op. 18, 27–28.

The majority relies, in part, on a characterization of Fordley's grievances that cannot be squared with the record. Specifically, the majority asserts that Fordley did not assert the claims at issue here—that he was physically and sexually assaulted—in his May 2016 grievance, but instead only alleged those claims in his March 2016 grievance. The majority reasons that Fordley exhausted remedies for these assault claims and that they were not "unexhausted" by his subsequent grievance and the prison's investigation of these claims on the merits. Maj. Op. 23, 25, 27–28.

Thus, the majority wrongly concludes that courts can deem a prisoner's claims exhausted if prison officials failed to timely respond to a grievance, *even if administrative remedies are available at the time the prisoner files suit*. Maj. Op. 22, 25–28. But in *Ross v. Blake*, the Supreme Court rejected such equitable exceptions to the PLRA's exhaustion requirement and explained that the statute unambiguously provides that "[n]o action shall be brought" absent exhaustion of available administrative remedies. 136 S. Ct. 1850, 1856 (2016) (quoting 42 U.S.C. § 1997e(a)). Therefore, if administrative remedies are available, a prisoner has not exhausted his claims under the mandatory terms of the PLRA. *Id.*

While I agree that in some circumstances a prison's failure to timely respond to a prisoner's grievance may prevent the prisoner from using the grievance system, thus

rendering administrative remedies unavailable, *see* Maj. Op. 22 & n.8, the majority's holding goes far beyond that unremarkable proposition.   And although the majority disavows any bright-line test, Maj. Op. 28, its exhaustion analysis in effect establishes a rule that a prison's failure to timely respond to a grievance means a prisoner's claims are deemed exhausted, *even if administrative remedies are available*.  Maj. Op. 19, 22–23, 25–26, 27–28.  Because the majority mischaracterizes the record and its analysis cannot be reconciled with the PLRA's mandatory exhaustion requirement and the Supreme Court's explication of that requirement in *Ross*, 136 S. Ct. at 1856–58, I respectfully dissent.

## I.

The majority mischaracterizes the record to assert that Fordley alleged that he was physically and sexually assaulted on March 10 and 11, 2016 *only* in the March grievance and that he merely "referred to" or "mentioned" these alleged assaults in the May grievance to provide context for his other claims.  Maj. Op. 9, 12, 16–17, 23–25, 27.  Based on this false premise, the majority asserts that even though prison officials accepted Fordley's May grievance and investigated the merits of Fordley's claims that on March 10 and 11, 2016 he was physically and sexually assaulted, the prison did not respond to the March grievance and therefore administrative remedies were unavailable to him.  Maj. Op. 19, 21, 22–24.  Although lengthy, the following detailed examination of Fordley's grievances and the prison's responses is necessary to clarify the record.

As an initial matter, it is worth noting that Fordley admitted in his complaint that his requests for administrative

relief on his claims were "pending" and "still in Sacramento at Chief of Appeals Office."[3]  Even if we were to disregard these sworn statements in Fordley's complaint as mistaken, we cannot disregard the record.  And, as set forth below, the record overwhelmingly supports Fordley's admissions that he did not exhaust his administrative remedies for his claims. The record clearly establishes the following timeline for Fordley's March, May, and June 2016 administrative grievances, including the specific claims in each of those grievances.

1.  *March 2016 Grievance*.  The March 2016 grievance is not in the record because neither party has possession of it, but the defendants do not dispute that Fordley filed a grievance on March 27, 2016, and that prison staff received it on March 28, 2016.  The only information in the record about this grievance comes from Fordley's subsequent requests for information (CDCR Form 22s) that he filed on April 5, 2016 and April 12, 2016.

a.  On April 5, 2016, Fordley filed a request for information that focused on a grievance about missing property that he had filed at a different prison.  But he included a final sentence stating:  "I filed a staff assult complaint here in March havent heard noth."[4]  Prison staff responded to his statement about the March grievance by

---

[3] In his complaint, Fordley asserted three claims and for each claim stated that administrative remedies were available for his claims, that he submitted a request for administrative relief, and that his "appeal [of his] request for relief . . . to the highest level" was "pending."

[4] The quoted language from Fordley's grievances, requests for information, and other filings includes his errors in spelling, punctuation, and grammar.  I have omitted using "sic" to indicate these errors.

stating: "The appeal you reference having filed here has been received and will be processed in the order received."

b.   On April 12, 2016, Fordley filed another CDCR 22 stating:

> I filed a CDCR 602 because of safty concerns and harrassment & assult by CDCR staff which per (op) is supposed to be processed immediately.  But your dening me that.  Your [illegible] to file both of my CDCR 602s I filed due to assult and discrimination.  Why? Ive written the wardens office and internal affairs as well as my attorney, Sacramento & appeals coordinator due to this hatred & discrimination against me.

In response, prison staff noted at the bottom of the form: "Your two appeals dated 3-27-16 and 4-13-16 have been received + are being processed."

c.   On April 15, 2012, prison staff sent Fordley a CDCR Form 695, Screening for CDCR 602 Inmate/Parolee Appeals, "RE: Screening at the FIRST level."  This form advised Fordley as follows: "Appeal Received, 03/28/2016; Appeal dated 03/27/16."  It further stated:  "Be advised that your appeal was previously received and is in process."

From Fordley's requests for information about the processing of his March 2016 grievance, we can determine only that he described his March 2016 grievance as alleging that on some unspecified date or dates in March 2016, unnamed CDCR staff subjected Fordley to safety concerns, harassment, and assault—purportedly requiring immediate

processing as a result—and that unnamed CDCR staff further subjected him to "assult and discrimination" as well as "hatred and discrimination."**[5]**

2. *May 2016 Grievance.* On May 8, 2016, Fordley filed a grievance on CDCR Form 602, and it was assigned Log No. MCSP-C-16-01365. Near the top of the form, on the line directing the filer to "State briefly the subject of your appeal (Example: damaged TV, job removal, etc.)," Fordley wrote: "Harrassment/Giving me Contraband—CDCR Staff." In the first section of the form, Section A, which instructs the filer to "Explain your issue," Fordley stated:

> In March on the 26th 2016, I filed a sexual assult complaint against officers in ASU Building 12, I also filed a assult complaint

---

**[5]** On this scant record, the majority suggests that we can determine that Fordley's March 2016 grievance asserted an emergency claim and should have been processed in five days. Maj. Op. 18–21; Cal. Code Regs. tit. 15, § 3084.9(a)(1), (4) (2015). The majority asserts that the district court also reached this conclusion. Maj. Op. 21. But the district court improperly relied on section 3084.9(a)(5), which was not in effect at the time Fordley filed his March grievance. *See* Cal. Code Regs. tit. 15, § 3084.9(a)(5) (2016) (stating that "[a] grievance in whole or part containing allegations of sexual violence or staff sexual misconduct shall be processed as an emergency appeal"). Moreover, the majority does not, and cannot, cite any support for its suggestion that because the prison did not timely respond to an emergency appeal, administrative remedies were not available to Fordley. Indeed, the majority's argument is defeated by *Booth v. Churner*, where the Court held that the unavailability of a specific form of relief does not render administrative remedies unavailable. 532 U.S. 731, 736, 738–41 & n.6 (2001) (holding that prisoner had to exhaust available administrative procedures even though they could not result in the relief he sought, namely damages). Here, regardless of the availability of emergency processing, regular processing provided the opportunity for some relief for Fordley's claims. *See id.*

against officers in B Complex. All this assult and sexual assult took place March 9th, 10th, 11th 2016, when returning from the hospital these officers kept harrassing me and threatening me. On May 2nd (one of the C/Os who sexually assaulted me on March 10th 2016,) became the regular in A5. I told them for 2 months I wasnt safe. Now back in ASU, Officer Winfield and Sgt Watson tried to have me kill myself by handing me a orange razor and told me to kill myself or they would. I turned it in to a Lt, who 206 told to see me on 5/5/2016 around 720 pm, then on 5/6/2016 at breakfast time I was given another razor by Winfield and Officer Garcia which I turned in again to the same Lt Appret: same time 720 pm after he was seeing 206. Again, they keep handing me contraband to kill myself, and if I dont they will they say 106-Mullers and 206 and 205 before they moved them are witnesses. They refuse to give me meals sheets, ect. You trying to kill me/set me up.

a. On May 11, 2016, prison staff indicated in Sections C and D of the May grievance form that the first level of review was "bypass[ed]." That same day, prison officials also sent Fordley a CDCR Form 695 Screening for Inmate/Parolee Appeals, "RE: Screening at the FIRST level," for Log. No. MCSP-C-16-01365, "STAFF COMPLAINTS, Sexual Misconduct, 05/11/2016." This form stated: "Be advised your appeal was received and is in process."

b. On May 19, 2016, prison staff indicated in Section E of the May grievance form that the grievance was accepted

at the second level of review.  That same day, prison officials sent Fordley an Inmate Appeal Assignment Notice, regarding Log No. MCSP-C-16-01365, identifying the appeal issue as "Staff Complaints."

c.  On June 22, 2016, prison officials sent Fordley a memorandum entitled "Staff Complaint Response—Appeal # MCSP-C-16-01365 *Second* Level Response."    This memorandum describes the "appeal issue," in relevant part, as follows[6]:

> FORDLEY's appeal alleges Correctional Officer M. Winkfield, Correctional Officer K. Garcia, and Sergeant J. Watson battered and sexually assaulted him on March 10, 2016. On this same date, FORDLEY alleges Sgt. Watson taunted him while FORDLEY was being held in a holding cell in Building 12. FORDLEY alleges Officers Winkfield and Officer Garcia battered and sexually assaulted him on March 11, 2016.

This memorandum also advised Fordley that his claims were "[b]eing processed as an Appeal Inquiry."

Next, the memorandum summarized the appeal inquiry and described, in detail, the two interviews Fordley had with reviewer J. Carrillo on May 10, 2016 and June 7, 2016.  In

---

[6] I have omitted the description of Fordley's allegations that on May 5 and 6, 2016, Officers Winkfield and Garcia gave him razor blades and told him to kill himself and that staff in Building 12 refused to provide him meals.

the May 10, 2016 interview, Fordley described the physical and sexual assaults on March 10 and 11, 2016[7]:

> On May 10, 2016, I conducted an interview with you in ASU regarding your misconduct allegations against staff in Building 12. You stated on March 9, 2016, you arrived to MCSP and subsequently remanded to ASU after being involved in a physical altercation with an inmate on Facility "B." You state on March 10, 2016, when you complained to staff in Building 12 you were not receiving your medical supplies, Sgt. Watson, Winkfield and Garcia arrived at your door and stated, "F-ck you. You're not getting nothing. We don't put up with this crap over here. Listen to us or we're going to make you listen." Upon making this statement, you claim Watson immediately announced (via radio) that he had an unresponsive inmate and proceeded to enter [your] cell with Winkfield and Garcia. During the extraction, you claim Winkfield utilized the shield and "cracked your head open" after you rushed staff. You stated after you were slammed to the floor, staff began to punch and kick you. You claim it was during this time, Winkfield placed his

---

[7] In the June 7, 2016 interview, Fordley described his allegations that, on May 5 and 6, 2016, Officers Winkfield and Garcia gave him razorblades and implied that he should kill himself and that they told him to kill himself or they would kill him. Fordley also described his allegations that staff in Building 12 were refusing to feed him, and that he had lost a substantial amount of weight and was emaciated.

"knight stick" (baton) between [your] buttocks and laughed and stated, "Next time I'll put it inside your a--." You claim after you were placed in handcuffs, you were escorted out of the cell and placed in a holding cell. You claim as you were in the holding cell, Sgt. Watson began to taunt you by bragging about the extraction. When asked if you received medical attention, you stated you refused medical attention even though you were bleeding profusely. You stated you were then escorted back to your cell without incident. You stated the next morning, on March 11, 2016, when you complained that Officer Vasquez had turned off the water in your cell, Winkfield, Garcia and an unidentified Sergeant extracted you again. You claim that during the extraction, you again were beaten and had a baton placed between your buttocks by Winkfield. When asked if you were penetrated during the incident(s), you clarified your anal cavity was never penetrated.

Finally, the memorandum advised Fordley that several correctional officers and inmates had been interviewed, various documents were reviewed, and the appeal inquiry was complete. The memorandum concluded that staff did not violate CDCR policy with respect "to one or more of the issues appealed." The memorandum also advised Fordley: "If you wish to appeal the decision and/or exhaust administrative remedies, you must submit your staff complaint appeal through all levels of appeal review up to, and including, the Secretary's/Third Level of Review. Once

a decision has been rendered at the Third Level, administrative remedies will be considered exhausted."

d. On July 6, 2016, in Section F of the May grievance form, which directs the filer, if dissatisfied with the second-level response, to explain his reasons, attach supporting documents, and mail it for third-level review, Fordley stated:

> Yes these people sexually and physically assulted me. You mother f-ckers always try to push crap under the carpet. You assulted me, I have evidence the 7219 showing bodly fluids that didn't belong to me. You assulted me on March 9th 2016 [illegible], March 10th 2016; you assulted me in ASU saying I was unresponsive and again March 11th 2016. In [illegible] you sexually assulted me and this a--hole from ISU Sgt J Carrillo keep saying on video on May 10th 2016 did they stick it in your a--, how far how do you know its sexually assult and now they harrass me everyday the same officers and Sgt who sexually assulted me and physically assulted me, they refuse to feed me, give me medical supplies and physically threaten me everyday with beating me or sexually assulting me again but you people always justifiey your actions so a person hangs themselfs or kills themselfs from the torture. You every f-cken day keep torturing me. It took 1½ months to accept my complaints, a violation already. You gave me orange state razors to kill

myself.  The only way one gets these is from staff.

e.   On August 15, 2016, while his appeal to the third-level review was still pending, Fordley filed his civil rights complaint in the district court.

f.   On March 10, 2017, prison officials issued the Third Level Appeal Decision and denied Fordley's appeal. The third-level decision considered "[a]ll submitted documentation and supporting arguments of the parties," explained that "[t]he Second Level of Review (SLR) identified and addressed the appellant's allegations of staff misconduct," and concluded that at the third level of review "the appellant's allegations were appropriately reviewed and evaluated by administrative staff."  The Third Level Appeal Decision also stated that "[t]his decision exhausts the administrative remedy available to the appellant within CDCR."

In contrast to the repeated and explicit allegations—throughout Fordley's May grievance, his appeals of that grievance, and the responses to that grievance—that he was physically and sexually assaulted in March 2016, the majority asserts that "the May grievance was not directed at the March assaults and was not understood by the prison officials to be a complaint about those assaults." Maj. Op. 25.  But given the prison's repeated statements about the appeal inquiry, that assertion strains credulity.  It is beyond dispute that Fordley asserted his claims that he was physically and sexually assaulted in his appeals to the second and third levels of

review and the prison accepted these claims and investigated them on the merits.**[8]**

Fordley's May grievance clearly related to the March 2016 physical and sexual assault claims, and it was still in process when Fordley filed suit. Thus, Fordley had not exhausted his administrative remedies because the "administrative process ha[d] authority to take *some* action in response to [his] complaint," specifically a review of the second-level decision. *Brown v. Valoff*, 422 F.3d 926, 934 (9th Cir. 2005) (quoting *Booth v. Churner*, 532 U.S. 731, 736 (2001)); *see id.* at 942 ("[A] prisoner may *not* proceed to federal court while exhausting administrative remedies . . . ." (citation omitted)).

3.  *June 2016 Grievance*. In the meantime, on June 12, 2016, while his May grievance was still pending in the administrative process, Fordley filed a third grievance, assigned Log No. MCSP-C-16-01704, and in Section A of the CDCR 602 alleged that Officer Winkfield harassed him and "mess[ed] with [his] food" because on June 8, 2016, the day

---

**[8]** The majority also argues that the third level of review did not explicitly discuss Fordley's physical and sexual assault claims. Maj. Op. 23–25. But even if the broad statements in the third-level decision were not sufficient to encompass Fordley's assault claims, the second-level decision clearly addressed these claims, as the majority acknowledges. Maj. Op. 21 n.7, 23–24. And where "there is an ongoing investigation into the facts underlying the grievance, . . . prison officials may develop information" that could lead to corrective action, and thus, the availability of relief. *Brown v. Valoff*, 422 F.3d 926, 936 (9th Cir. 2005). Thus, because the second-level response to the May grievance addressed Fordley's claims that he was physically and sexually assaulted in March 2016, Fordley appealed that response, and the third-level response had not been issued when Fordley filed his complaint, Fordley had available administrative remedies.

after his second interview with J. Carrillo in ISU, Winkfield gave him a paper tray instead of a regular tray.[9]  Fordley further stated:

> this harrassment, mental/sexual/physical will continue until you get me out of here or I kill myself or the court intervens, everyday I'm being harrassed by Officer Winfield and now he has other officers doing his dirty work.  I believe ISU is involved, the Sgt of ISU kept asking me how far did they stick the stick in your a--, that isn't helping its harrassing me. A paper trail is a mother f-cker.

The appeal bypassed the first level of review and was accepted for the second level of review.

a.   On July 15, 2016, prison officials sent Fordley a memorandum entitled "Staff Complaint Response—Appeal # MCSP-C-16-01704 Second Level Response."  The memorandum described the "Appeal Issue" as "Inmate FORDLEY alleges Correctional Officer M. Winkfield is threatening and harassing him."  The memorandum further explained that Lt. Altschuler interviewed Fordley on July 9, 2016, and Fordley stated that "everything is in the CDCR 602" and answered questions.  Fordley's appeal was denied at the second level of review, and the second-level decision advised him of his rights "to appeal the decision and/or exhaust administrative remedies" and that he must submit his complaint through all levels of appeal review up to and including the third level of review.

---

[9] Fordley identifies this corrections officer as "Winfield" and "Winkfield," but the prison identifies him as "Winkfield."

b.   On August 1, 2016, Fordley appealed the second-level decision to the third level of review.  In Section F of the June grievance he stated:

> I am dissatisfied.   Officer Winkfield and Garcia always sexual harrass me and threaten me daily.  They grab there nuts and tell me its my next meal.  But you f-cken people don't want to know the truth because your afraid what the truth will tell you:  look at the weight loss on my chart.  They spit in my food, and I pull it out or save the tray and you refuse to come get the evidence, they gave me paper trays for no reason 2½ months and tell me to enjoy my food, they spiced it up, they constantly grab there nuts and tell me its my next meat or they say there going to rape me with the paton again only next time the whole stick goes up my a--.  I can't handle it[,] they say I don't come out of my cell for nothing, I cut my arm 5 times and put blood on the window while I [illegible] up on there s-it. Everyday they walk by, by saying let him kill himself, they gave me orange razors on May 5 and 6 to kill myself, this is harrassment, mental and physical and sexual harrassment everyday on 2nd watch and you people think, well I'll talk to the inmate and that will conclude my investigation.

Fordley's appeal was accepted at the third level of review but later denied.

c.  On August 15, 2016, while Fordley's appeal of his June grievance to the third level of review was pending, Fordley filed his civil rights complaint.

d.  On January 23, 2017, prison officials issued the Third Level Appeal Decision and denied Fordley's appeal. "This decision exhaust[ed] the administrative remedy available to the appellant within CDCR."

\* \* \*

The May and June grievances demonstrate that Fordley repeatedly raised his claims that he was physically and sexually assaulted in March 2016.  In contrast to the majority's speculation that the prison could have canceled Fordley's claims as untimely or duplicative, Cal. Code Regs. tit. 15, § 3084.6(c)(2), (4) (2015), Maj. Op. 26, the history of Fordley's grievances and the appeals process clearly establishes that it did not do so and that it did not take any action to improperly screen Fordley's claims.  Rather, the prison processed and responded to his claims of physical and sexual assault on the merits.  The majority simply misstates the record by suggesting that the prison did not do so.

## II.

The majority, however, does not rely solely on its mischaracterization of the history of Fordley's grievances. Instead, it argues that "[e]ven if the May grievance had comprised an unambiguous, standalone reassertion of a grievance concerning the March assaults, we have no case law supporting defendants' suggestion that an inmate's reassertion of a concern—especially a request for a response to an ignored emergency grievance—somehow operates to

unexhaust a previously exhausted claim." Maj. Op. 25. The majority then repeatedly states in various formulations throughout the opinion the basic premise of its exhaustion analysis: an exhausted grievance cannot be "unexhausted." Maj. Op. 23, 25, 27–28. This premise is flawed because it imports a fairness analysis into the PLRA's mandatory exhaustion requirement, it focuses the exhaustion analysis at some time other than when the prisoner files his complaint in federal court, and it assumes circumstances that are not present in this case.

## A.

The majority's conclusion that an exhausted claim cannot be "unexhausted" adopts Fordley's reasoning that it was unfair to consider his second grievance, and the availability of administrative remedies for the claims in that grievance, when determining if he exhausted his claims. As Fordley stated in his opening brief, his "decision to file a *second* grievance did not somehow excuse the prison's failure to process the first grievance. [He] was under no obligation to file that grievance and should not be penalized for his good faith efforts to continue working within the prison grievance system."

The majority makes its fairness analysis of the exhaustion requirement even more explicit when it states that "[t]he prison's choice to respond to the May grievance by interviewing Fordley about the March assaults cannot be accurately described as an attempt by Fordley to give the prison officials another shot at responding to the March assaults." Maj. Op. 24. Thus, the majority essentially adopts the reasoning of the Third Circuit in *Shifflett v. Korszniak* that it is unfair to require a prisoner to exhaust available remedies

if prison officials have not strictly complied with their own regulations.  934 F.3d 356, 367 (3d Cir. 2019) ("The PLRA requires strict compliance by prisoners seeking redress of their grievances, and by the same token we hold that it requires strict compliance by prison officials with their own policies.").

By applying a fairness analysis to deem a claim exhausted even if administrative remedies are available at the time a prisoner files suit, the majority applies a form of "judicial discretion" to modify the PLRA's exhaustion requirement. *See Ross*, 136 S. Ct. at 1857.  In *Ross*, the Court rejected a similar "extra-textual" or "judge-made" exception to the PLRA's "mandatory" exhaustion requirement.  *Id.* at 1856–58.  The Court held that "special circumstances," such as a prisoner's mistaken but reasonable belief that he had sufficiently exhausted remedies, could not limit the prisoner's obligation to exhaust remedies.[10]  *Id.* at 1858.

---

[10] The Court further explained that in enacting the PLRA Congress substituted an "invigorated" exhaustion requirement in place of the "discretionary" and "inadequate" exhaustion provisions of the Civil Rights of Institutionalized Persons Act (CRIPA), which required exhaustion only if a state provided "plain, speedy, and effective" remedies, and only then, if exhaustion were deemed "appropriate and in the interests of justice." *Ross*, 136 S. Ct. at 1858–59 (citation omitted).  The Court concluded that a "special circumstances" exception to exhaustion, even if limited to cases in which a prisoner makes a reasonable mistake about the meaning of grievance procedures, "would resurrect CRIPA's scheme" by reintroducing the "requirement that the remedial process be 'plain.'" *Id.* at 1858.  Similarly, the majority's conclusion here that a prison's failure to timely respond to a grievance renders remedies unavailable improperly reintroduces the requirement that the remedial process be "speedy." *See id.*

In rejecting such exceptions, the Supreme Court explained that "courts have a role in creating exceptions only if Congress wants them to." *Id.* at 1857. Thus, "mandatory exhaustion statutes like the PLRA establish mandatory exhaustion regimes, foreclosing judicial discretion." *Id.* (citation omitted). The Court further explained that "[t]ime and again, this Court has taken such statutes at face value—refusing to add unwritten limits onto their rigorous textual requirements." *Id.* (citations omitted). And, as particularly relevant here, the Court stated that "the PLRA prevent[s] a court from deciding that exhaustion would be unjust or inappropriate in a given case." *Id.* at 1858. Therefore, "all inmates must now exhaust all available remedies: 'Exhaustion is no longer left to the discretion of the district court.'" *Id.* (quoting *Woodford v. Ngo*, 548 U.S. 81, 85 (2006)).

The exhaustion "edict" of the PLRA has only one qualifier—"the remedies must indeed be 'available' to the prisoner."[11] *Id.* at 1856. Thus, the PLRA's "exhaustion requirement hinges on the 'availab[ility]' of administrative remedies." *Id.* at 1858 (alternation in original). Administrative remedies are available under § 1997e(a) when they "are 'capable of use' to obtain 'some relief for the action complained of.'" *Id.* at 1858–59 (citation omitted) (applying

---

[11] The Court identified three circumstances in which administrative remedies, "although officially on the books," would not be available: (1) when an administrative procedure operates as a "dead end" and prison officials are "unable or consistently unwilling to provide any relief"; (2) when an administrative scheme is "so opaque that it becomes . . . incapable of use"; and (3) "when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Ross*, 136 S. Ct. at 1859–60 (citation omitted). These circumstances are not present in this case.

ordinary meaning of the word "available" and collecting dictionary definitions).

We have applied a similar explanation of available remedies, stating that administrative relief is available when "the administrative process has authority to take *some* action in response to a complaint." *Brown*, 422 F.3d at 934 (quoting *Booth*, 532 U.S. at 736). Indeed, we held that a prisoner must "press on to exhaust further levels of review" until "he has either received all 'available' remedies at an intermediate level of review or been reliably informed by an administrator that no remedies are available." *Id.* at 935. Therefore, a prisoner's "obligation to exhaust 'available' remedies persists as long as *some* remedy remains 'available.'"[12] *Id.* And it is Fordley's burden to bring forward evidence to create a material dispute of fact on whether prison staff's delay in responding to the March 2016 grievance meant that there was no "possibility of some relief for the action complained of." *Id.* (quoting *Booth*, 532 U.S. at 738; other citation omitted); *see Albino v. Baca*, 747 F.3d 1162, 1172 (9th Cir. 2014) (en banc).

Here, as detailed in the history of the grievance processes in Section I, it is beyond dispute that administrative remedies were available to Fordley when he filed his complaint. Indeed, as Fordley admitted in his complaint, prison officials were addressing his claims on the merits when he decided not

---

[12] In *Brown*, we considered whether two prisoners, Brown and Hall, had exhausted administrative remedies before filing suit. *See* 422 F.3d 926. We concluded that while Brown had exhausted such remedies, Hall had not, in part, because he filed suit before the conclusion of a staff misconduct investigation, which was not part of the prison grievance process. *Id.* at 940, 942–43.

to wait for the conclusion of that process before filing suit. Consequently, Fordley did not exhaust administrative remedies and the district court properly granted the defendants' motions for summary judgment.

**B.**

Moreover, the majority's premise that an exhausted claim cannot be unexhausted also conflicts with our precedent because it attempts to focus the exhaustion analysis on some time other than when the prisoner files suit. But our case law establishes that we examine the availability of administrative remedies "at the time the action is filed." *Andres v. Marshall*, 867 F.3d 1076, 1079 (9th Cir. 2017) (per curiam) (citation omitted); *see also Brown*, 422 F.3d at 942 ("[A] prisoner may *not* proceed to federal court while exhausting administrative remedies . . . ." (citation omitted)). Even Fordley concedes that "the exhaustion inquiry looks to the state of the world at the time the complaint was filed."

The majority nonetheless justifies determining exhaustion at a time other than when the prisoner filed his complaint by stating that "once an administrative remedy is exhausted, a claimant need not do more." Maj. Op. 22–23 (citing *Brown*, 422 F.3d at 935 n.10; other citation omitted). But the majority necessarily assumes that Fordley's claims were exhausted as soon as prison officials failed to timely respond to his initial grievance.[13] Under some circumstances that may

---

[13] The majority's analysis is based on the fundamental misconception that the prison's failure to timely respond to the March grievance under the prison's own regulations, in and of itself, rendered administrative remedies unavailable. Maj. Op. 27. But the applicable regulations provide that "time limits are directory, and the failure to meet them does

be true.  However, here, prison officials accepted Fordley's subsequent grievances and processed them on the merits, demonstrating that the prison's failure to timely respond to Fordley's first grievance did not render administrative remedies unavailable.[14]

The majority's analysis does not consider whether administrative remedies were available *after* prison officials failed to timely respond to a grievance and whether those remedies *remained available* at the time he filed suit.  But we must view the availability of administrative relief from the lens of "how the prison viewed and treated the[] complaint based on its own procedures," *Brown*, 422 F.3d at 942 n.17, especially considering that it is "difficult to imagine an activity in which a State has a stronger interest, or one that is

not preclude taking the specified action beyond the time limits."  Cal. Code Regs. tit. 15, § 3000.5(f) (2015).

[14] For example, the majority argues that after the prison failed to timely respond to the March 2016 grievance Fordley had "no recourse" because the regulatory scheme did not allow him to file a second, duplicative, or untimely grievance.  Maj. Op. 26.  But the regulatory provisions allowing cancellation of grievances are not mandatory.  Instead, by their terms, these procedures are discretionary.  The regulations state that the appeals coordinator "may" cancel grievances for many reasons.  *See* Cal. Code Regs. tit. 15, § 3084.6(c)(2), (4) (2015).  Thus, because prison officials had discretion in determining whether to cancel the May grievance, there was a possibility of some relief and the PLRA required that Fordley wait for the completion of the processes he invoked by filing that grievance.  *See Brown*, 422 F.3d at 935.  Moreover, the regulations provide that the cancellation of a grievance may be separately appealed, Cal. Code Regs. tit. 15, § 3084.6(e), thereby providing another potential avenue for relief had the prison canceled Fordley's May grievance.  At bottom, the majority's analysis "hinges" not on the availability of relief but instead on hypotheticals founded on nothing in the record.  *See Ross*, 136 S. Ct. at 1858.

more intricately bound up with state laws, regulations, and procedures, than the administration of its prisons," *Woodford*, 548 U.S. at 94 (citation omitted).

Here, even if prison officials could have rejected Fordley's May 2016 grievance on procedural grounds, they did not do so. Instead, they accepted the May grievance, granted partial relief, initiated an investigation, and responded to it on the merits. Thus, the May 2016 grievance triggered the possibility of administrative remedies, and "[w]e are bound by the literal command of the PLRA, which precludes an action by a prisoner 'until such available administrative remedies as are available have been exhausted.'" *Panaro v. City of North Las Vegas*, 432 F.3d 949, 953 (9th Cir. 2005) (quoting 42 U.S.C. § 1997e(a)). Fordley's failure to do so means he did not exhaust his administrative remedies. *See Brown*, 422 F.3d at 936, 941–43.

## III.

Administrative remedies are exhausted when they are no longer available. *See Ross*, 136 S. Ct. at 1856, 1859–60. So long as there is a "possibility of some relief for the action complained of," remedies are available. *Brown*, 422 F.3d at 935 (citations omitted). The administrative process was available here because Fordley was actively using it at the time he filed suit and that process provided potential remedies for his claims. Therefore, Fordley did not exhaust his claims that he was assaulted in March 2016, and the majority errs when it allows Fordley to evade his obligation to do so. Because Fordley did not exhaust his claims, the defendants were entitled to summary judgment. I respectfully dissent.